IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK J. TENENBAUM       :

                          :

    v.                  :    Civil Action No. DKC 10-2215

                          :

PNC BANK NATIONAL ASSOC.,
et al.                   :

**MEMORANDUM OPINION**

Presently pending in this fraud action are two motions to dismiss filed by Defendants PNC Bank National Association ("PNC") and Robert Geoghegan. (ECF Nos. 15, 16). PNC asserts that, among other things, Plaintiff Mark Tenenbaum never timely served it with the complaint and summons. Geoghegan concedes timely service, but argues that the complaint fails to state a claim against him. The issues are fully briefed and the court now rules, as no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, PNC's motion will be granted, while Geoghegan's motion will be granted in part and denied in part.

I. **Background**

A. **Factual Background[1]**

Some time before 2006, Tenenbaum decided that he wanted to buy a business. Around the same period, he met Roderick G.

---

[1]    These facts come from Tenenbaum's amended complaint.

Morrison, Vice President of a PNC branch in Columbia, Maryland. Tenenbaum, who has no special financial or accounting expertise, apparently concluded Morrison was the man to help him decide which business to purchase. He soon began talking with Morrison "on a regular basis." (ECF No. 11 ¶ 12).

In the spring of 2006, Tenenbaum read an advertisement offering for a sale a company called Professional Heating and Cooling, Inc. ("Professional"). At that time, Geoghegan owned Professional. As he had done with a prior investment opportunity, Tenenbaum went to Morrison for advice on the possible purchase of Professional. According to Tenenbaum, the two men spoke about Professional "on many occasions." (*Id.* ¶ 14).

Tenenbaum ultimately decided to buy Professional. To finance the transaction, he applied for financing with PNC through the bank's Small Business Administration ("SBA") loan program. PNC approved Tenenbaum for a $1.395 million SBA-guaranteed loan on August 30, 2006. According to the amended complaint, the SBA guarantees that the lender would be repaid up to 75% of the loan if the loan were to "go bad." (*Id.* ¶ 10).

Up to the time of closing, and apparently even before he applied for a loan, Tenenbaum purportedly shared all the relevant due diligence materials with PNC and Morrison. Once he began the loan application process, PNC received such materials

directly from Geoghegan. Tenenbaum maintains that he told Morrison that he was "relying on [him] to make sure he was purchasing a sound business" and needed PNC to "look out for him." (*Id.* ¶¶ 15, 17). According to Tenenbaum, Morrison said he understood him, assured Tenenbaum that he would make sure that buying Professional was not a "mistake," and promised the bank would "turn [Professional] inside out" by requesting "a lot of financial information." (*Id.*).

According to the amended complaint, Tenenbaum received confirmation from both PNC and Geoghegan that Professional's 2006 revenue was strong. As the mid-October 2006 closing date approached, Morrison reassured Tenenbaum that "everything looked o.k." with regard to Professional's financial history. (*Id.* ¶ 18). In a memorandum sent September 26, 2006, Geoghegan also reported that Professional's 2006 revenue was tracking "reasonably close to 2005 and that he expected to have similar revenue." (*Id.* ¶ 19).

In truth, Geoghegan – allegedly with PNC's knowledge – had misrepresented Professional's 2006 financial performance. The reality was that Professional's revenue had deteriorated. Tenenbaum says PNC nevertheless kept him from seeing the 2006 revenue numbers to ensure that he would go through with closing. PNC purportedly "did not care whether Mr. Tenenbaum was

purchasing a failing business" because of the SBA guarantee. (*Id.* ¶ 20).

Because he was not aware of Professional's declining revenues, Tenenbaum went through with the purchase and operated Professional from November 2006 to September 2007. Unfortunately, Professional's revenue remained "significantly less than what was represented" at the time of purchase. (*Id.* ¶ 25). After learning of the company's real financial state in late 2007, Tenenbaum was forced to close the business on September 17, 2007.

### B.    Procedural Background

On August 11, 2010, Tenenbaum filed a one-count complaint in this court, which asserted a single "fraud/misrepresentation" claim against both defendants. (ECF No. 1).

Neither PNC nor Geoghegan entered an appearance for several months. Consequently, on December 20, the court ordered Tenenbaum to show cause why the complaint should not be dismissed for failure to serve process. (ECF No. 3). Tenenbaum responded on January 2, 2011, indicating that he had served PNC on December 22, 2010 – 133 days after he filed his complaint – but that he had not yet been able to serve Geoghegan. (ECF No. 5). Although he acknowledged that service was untimely, he asked that service on PNC be "accepted by the Court" and requested an additional 30 days to serve Geoghegan. (*Id.* at 2).

In a paperless order the next day, the court approved
"Plaintiff's request for extension of time to serve summons" and
ordered Tenenbaum to serve Geoghegan no later than February 3,
2011. (ECF No. 6).

Once Tenenbaum served Geoghegan and PNC, both Defendants
filed motions to dismiss. (ECF Nos. 8, 10). Tenenbaum filed an
amended, four-count complaint on January 28, 2011, mooting the
motions to dismiss. (ECF No. 11). In addition to the original
fraud claim, the amended complaint introduced three new claims:
breach of the covenant of good faith and fair dealing, breach of
fiduciary duty, and fraudulent concealment. (*Id.* ¶¶ 34-56).
Defendants then filed new motions to dismiss on February 14.
(ECF Nos. 15, 16). Tenenbaum opposed on March 3, 2011. (ECF
No. 19). PNC replied shortly thereafter (ECF No. 20) and
Geoghegan did not file any reply.

## II. Standard of Review

The purpose of a motion to dismiss pursuant to Rule
12(b)(6) is to test the sufficiency of the complaint. *Presley
v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).
Accordingly, the court must consider all well-pleaded
allegations in a complaint as true, *Albright v. Oliver*, 510 U.S.
266, 268 (1994), and must construe all factual allegations in
the light most favorable to the plaintiff, *Harrison v.
Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir.

5

1999). The court need not take everything as true, however. For instance, the court need not accept unsupported legal allegations. *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Nor must it agree with legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not show[n] . . . that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1950 (quotation marks omitted).

## III. Analysis

### A. Claims Against PNC

Generally, in any case filed in federal court, a plaintiff must serve each defendant with a copy of the complaint and a summons within 120 days. Fed.R.Civ.P. 4(m). If he fails to do so, Federal Rule of Civil Procedure 4(m) requires that the complaint be dismissed without prejudice. If, however, the plaintiff can show good cause for his delay, then the 120-day deadline must be extended. *Id.*

Tenenbaum did not serve PNC within 120 days. As a result, PNC maintains that the complaint must be dismissed without prejudice because of Tenenbaum's failure to comply with Rule

4(m)'s mandate.  In response, Tenenbaum maintains that the complaint should not be dismissed because he had reasons for his delay and the late service did not prejudice the bank.

The parties disagree over a basic question:  When is a party entitled to an extension of Rule 4(m)'s 120-day period for service?  PNC maintains that Tenenbaum must show either "good cause" or "excusable neglect" (or perhaps both) to justify untimely service.  Tenenbaum, on the other hand, insists that "[u]nder no circumstances would a litigant need to demonstrate 'excusable neglect'" and that the 120-deadline may be extended even without good cause.  (ECF No. 19, at 13).

At least at one time, the answer to the basic question was clear; good cause was required to excuse a delay in service beyond 120 days.  In *Mendez v. Elliot*, 45 F.3d 75, 79 (4th Cir. 1995), the United States Court of Appeals for the Fourth Circuit explained that, regardless of when a court acts (*i.e.*, whether it acts before or after the 120-day deadline has passed), "the court may only grant the extension for good cause."  And where the plaintiff fails to request an extension within the 120-day period, *Mendez* also requires the plaintiff to establish excusable neglect for failing to file a motion to extend before the deadline.  *Id*.

Although *Mendez* provided clear guidance for a time, confusion developed a year later when the Supreme Court

suggested a different approach - albeit in *dicta*.  In *Henderson v. United States*, 517 U.S. 654, 662 (1996), the Court observed that "courts have been accorded discretion to enlarge the 120-day period even if there is no good cause shown."  Taking their cue from *Henderson*, an overwhelming number of district courts in this circuit have questioned the continuing validity of *Mendez.* Indeed, in the last few years, the flood of cases doubting *Mendez* seems to have reached its crest.[2]

Several of these district court decisions find problems with *Mendez* beyond its conflict with Supreme Court dicta.  They note, for example, that the Fourth Circuit might have premised *Mendez* on an erroneous assumption about Rule 4(m).  In particular, *Mendez* took for granted that a December 1993 amendment to Rule 4 edited the rule "without a change in substance."  45 F.3d at 78.  The Advisory Committee Notes to

---

[2]    *See, e.g.*, *Perri-Clair v. Ace P'ship of Charleston SC*, No. 2:09-CV-1584-MBS, 2011 WL 765671, at *1 & n.1 (D.S.C. Feb. 23, 2011); *English v. Murphy*, No. 1:09-CV-00866, 2010 WL 1416763, at *3 & n.2 (M.D.N.C. Apr. 5, 2010); *Morgan v. Sebelius*, No. 3:09-1059, 2010 WL 1404100, at *1-2 (S.D.W.Va. Mar. 31, 2010); *Hardy v. Astrue*, No. 5:09CV112, 2010 WL 1138338, at *2-3 (N.D.W.Va. Mar. 19, 2010); *Harvey v. Capital Children's Dental Cntr.*, No. 3:09-1836-CMC-PJG, 2010 WL 1294120, at *1 (D.S.C. Mar. 4, 2010); *Lehner v. CVS Pharmacy*, No. RWT 08cv1170, 2010 WL 610755, at *2 (D.Md. Feb. 17, 2010); *Vantage, Inc. v. Vantage Travel Servs.*, No. 6:08-2765-HMH, 2009 WL 735893, at *2 (D.S.C. Mar. 20, 2009); *DiPaulo v. Potter*, 570 F.Supp.2d 802, 805 (M.D.N.C. 2008); *Velcovich v. Consol Energy, Inc.*, No. 5:07CV113, 2008 WL 4415428, at *8 (N.D.W.Va. Sept. 25, 2008).

Rule 4(m) contradict that conclusion; they explain that the "new subdivision authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown."

The district courts' analyses are persuasive, and they do not stand alone. In unpublished decisions since *Mendez*, the Fourth Circuit has itself taken different approaches to the issue.[3] Moreover, in contrast to *Mendez*, other circuit courts have universally determined that courts have discretion to extend the 120-day deadline, even where good cause is lacking. *See Hammad v. Tate Access Floors, Inc.*, 31 F.Supp.2d 524, 526 (D.Md. 1999) (listing cases). Some of these courts have

---

[3] *See, e.g.*, *Hansan v. Fairfax Cnty. Sch. Bd.*, 405 F.App'x 793, 793-94 (4th Cir. 2010) ("The district court must extend the 120-day period if the plaintiff shows good cause for his failure to serve the defendant. Additionally, the district court has discretion to extend the period if the plaintiff can show excusable neglect for his failure to serve." (citations omitted)); *Giacomo-Tano v. Levine*, No. 98-2060, 1999 WL 976481, at *2 (4th Cir. Oct. 27, 1999) ("Even if a plaintiff does not establish good cause, the district court may in its discretion grant an extension of time for service."); *Scruggs v. Spartanburg Reg'l Med. Ctr.*, No. 98-2364, 1999 WL 957698, at *2 (4th Cir. Oct. 19, 1999) ("[W]e believe that the district court, in its discretion, could have extended the time for proper service of process, notwithstanding its apparent belief to the contrary."); *but see* 4B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1137 (3d ed. 2010 supp.) ("Despite some unpublished opinions casting doubt upon the rule, the Fourth Circuit follows the principle that a district court may grant an extension only within the time limit for service of process through a showing of good cause.").

specifically cited - but rejected – the approach taken in *Mendez*.[4]

Yet while *Mendez* may stand on shaky footing, it remains the law of this circuit. Accordingly, several courts have recognized the binding force of *Mendez* and applied the good cause standard, even while recognizing the issues inherent in the standard's application. *See Knott v. Atl. Bingo Supply, Inc.*, No. JFM-05-1747, 2005 WL 3593743, at *1 n.1 (D.Md. Dec. 22, 2005) (describing cases). If this court were to take that approach, Tenenbaum would be ineligible for an extension because he has not presented good cause.

For a court to find good cause, the plaintiff must generally exercise reasonable diligence in trying to effect service. *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F.Supp.2d 432, 439 n.9 (D.Md. 2001). In other words, good cause may be found where the plaintiff has "taken some affirmative action to effectuate service of process upon the defendant or ha[s] been prohibited, through no fault of his own, from taking such an affirmative action." *Vincent v. Reynolds Memorial Hosp., Inc.*, 141 F.R.D. 436, 437 (N.D.W.Va. 1992).

_____

[4]   *See, e.g.*, *Horenkamp v. Van Winkle & Co., Inc.*, 402 F.3d 1129, 1132 n.4 (11th Cir. 2005); *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996); *Thompson v. Brown*, 91 F.3d 20, 21 n.1 (5th Cir. 1996).

A plaintiff may establish good cause in a number of ways. Good cause might be found, for instance, where a defendant is evading service, court staff misdirected a pro se plaintiff as to the appropriate procedure, or a plaintiff was unaware of the defect in service until after the deadline had passed. *Hoffman v. Baltimore Police Dep't*, 379 F.Supp.2d 778, 786 (D.Md. 2005); *see also* 4B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1137 (3[d] ed. 2010 supp.). The common thread amongst all of these examples is that the interference of some outside factor prevented the otherwise-diligent plaintiff from complying with the rule. *See Burns*, 166 F.Supp.2d at 439 n.9. In contrast, mere "inadvertence or neglect of counsel to file in timely fashion will not suffice." *Braithwaite v. Johns Hopkins Hosp.*, 160 F.R.D. 75, 77 (D.Md. 1995); *see also Vincent*, 141 F.R.D. at 438; *Quann v. Whitegate-Edgewater*, 112 F.R.D. 649, 662 (D.Md. 1986).

Tenenbaum has now had three opportunities to show good cause for his late service (*i.e.*, his responses to the court's show cause order and PNC's two motions to dismiss). He has largely repeated four basic reasons:

- Tenenbaum's counsel "had difficulty obtaining Plaintiff's complete file for this matter from a prior attorney and a financial professional." (ECF Nos. 5, at 2; 19, at 15).

- "The underlying transactions and history of this case are complex." (ECF Nos. 5, at 2; 19, at 15).

- Tenenbaum and counsel needed to gather documents and investigate the case; they considered waiting to file an amended complaint before serving Defendants. (ECF Nos. 5, at 2–3; 19, at 15).

- The statute of limitations could bar the case if it is dismissed. (ECF Nos. 5, at 2; 13, at 3).

None of these reasons establishes good cause.

It does not matter, for example, that Tenenbaum had difficulty obtaining a file. There is nothing to suggest that something in that file was necessary for Tenenbaum to effect service. Tenenbaum might have wanted the file to aid in the investigation of his claims, but that has nothing to do with a plaintiff's responsibility to inform a defendant that he has filed a case against him. If Tenenbaum did not have available the facts he needed to proceed, he should have waited to file his complaint. Otherwise, he should have been prepared to move forward with his case in accordance with the Federal Rules. A plaintiff cannot make a strategic decision to withhold service until he feels has all the materials he thinks he needs to proceed and then invoke "good cause" to excuse his delay. In a related fashion, Tenenbaum cannot establish good cause by pointing to his purported need to investigate facts in support of his amended complaint. *See Vincent*, 141 F.R.D. at 437–38.

Moreover, Tenenbaum's actions do not suggest that he was acting with the requisite degree of diligence. Even if continuing investigation were a valid reason to delay service,

one would expect a conscientious party to file a motion for an extension of the time for service *before* the 120-day period expired.  Tenenbaum did not.

The fact that this case is purportedly "complex" also is irrelevant.  For one, this case is no more complex than the many cases that people file and successfully serve on a daily basis in the federal system.  Even if the underlying facts found in the complaint were "complex," those facts do not affect the difficulty of service.  Rather, Tenenbaum faced the rather straightforward task of serving just two defendants with two documents.  Even parties and "attorneys involved in . . . complex suits are still expected to comply with the Federal Rules of Civil Procedure."  *Johnson v. Ashcroft*, No. 04-1158 (RMU), 2005 WL 2073752, at *3 n.4 (D.D.C. Aug. 17, 2005).

Moreover, the facts again belie this explanation for Tenenbaum's tardiness.  If service were somehow complex, a prudent plaintiff would have attempted service early to allow some time to get service right.  In contrast, Tenenbaum did not make any apparent attempt to serve PNC in any fashion until after the deadline.

Finally, it is of no moment that the statute of limitations may pose a barrier to any new complaint against PNC if the court dismisses Tenenbaum's present complaint.  "The 'good cause' inquiry . . . implicates the reason for failure to effect

service, not the severity of the consequences." *Pellegrin & Levine, Chtd. v. Antoine*, 961 F.2d 277, 283 (D.C. Cir. 1992); *see also Elkins v. Broome*, 213 F.R.D. 273, 276 (M.D.N.C. 2003); *Vincent*, 141 F.R.D. at 438. Finding good cause in every instance where the statute of limitations is a concern would effectively nullify the 120-day time limit because "as long as the refiling of the claim eventually became time-barred, [plaintiffs] would always have 'good cause' for an extension." *T&S Rentals v. United States*, 164 F.R.D. 422, 426 (N.D.W.Va. 1996). Such an approach would do great harm to Rule 4(m)'s goals of encouraging "more efficient, speedy and inexpensive litigation by transferring the burden of effecting service to the litigants." *Id.*

Even one can look past *Mendez* and extend the service period without good cause, there is no reason to do so here. The mere fact that a court *can* extend the period does not mean it *should*. The facts presented by Tenenbaum evidence a plaintiff who largely took no steps to serve any defendant for several months. Such procrastination should not be rewarded.

Lastly, Tenenbaum is incorrect in arguing that the court has already decided this issue. After issuing an order to show cause, the court granted Tenenbaum 30 additional days to serve Geoghegan. The paperless order granting the extension addressed only Geoghegan, *not* PNC. That omission was not accidental.

Tenenbaum did not provide any good reason for the untimely service on PNC either then or now. The court did not implicitly "accept" service merely because it failed to dismiss the case immediately after entering the show cause order.

Tenenbaum's claims against PNC will be dismissed without prejudice for failure to effect timely service.

**B.  Claims Against Geoghegan**

Geoghegan seeks dismissal of all counts against him on several bases. As explained below, counts one and four will be allowed to proceed. Counts two and three, on the other hand, will not.

**1.  Counts I and IV: Fraudulent Misrepresentation and Concealment**

Tenenbaum separately alleges fraudulent misrepresentation and fraudulent concealment, but the two causes of action share many common elements under Maryland law. *Rhee v. Highland Dev. Corp.*, 182 Md.App. 516, 535-36 (2008). To establish a fraudulent misrepresentation claim, the plaintiff must show that the defendant "(1) made a false representation; (2) knowingly or with reckless indifference to the truth; (3) for the purpose of defrauding the plaintiff; (4) that the plaintiff reasonably relied on the misrepresentation; and (5) that the plaintiff suffered damage directly resulting from the fraudulent misrepresentation." *Henderson v. Claire's Stores, Inc.*, 607

F.Supp.2d 725, 734 (D.Md. 2009). Similarly, to state a claim
for fraudulent concealment, a plaintiff generally must establish
(1) the defendant owed him a duty to disclose a material fact;
(2) the defendant failed to disclose that fact; (3) for the
purpose of defrauding the plaintiff; (4) that the plaintiff took
action in justifiable reliance on the concealment; and (5) he
suffered damage because of the concealment. *Odyssey v. Travel
Ctr., Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 628-29 (D.Md.
2003). Geoghegan maintains that the complaint lacks several of
the crucial elements of both of these claims.

Geoghegan first asserts that there was no misrepresentation
or omission because he provided all relevant information to PNC,
Tenenbaum's alleged fiduciary. The amended complaint states
that PNC received due diligence material directly from
Geoghegan, including material describing Professional's true
financial condition in January through September of 2006. (ECF
No. 11 ¶¶ 15, 21). Because PNC is alleged to be Tenenbaum's
fiduciary (*id.* ¶¶ 42-50), Geoghegan believes that PNC's
knowledge of Professional's true financial condition is
imputable to Tenenbaum. In response, Tenenbaum conclusorily
denies that "disclosure to PNC . . . is the same as disclosure
to Plaintiff." (ECF No. 18, at 4).

There is little authority to guide the court's decision on
this issue. Neither Tenenbaum nor Geoghegan cited any authority

16

in support of their respective positions.  Moreover, no apparent Maryland decision examines whether knowledge of a fiduciary such as PNC is necessarily attributable to the principal.

Some guidance is available in the well-defined principles applicable to one "species" of fiduciary relationship, the agent-principal relation.  *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md.App. 123, 161 (1992).  A basic principle of the agency relationship, for instance, is that the knowledge of the agent is the knowledge of the principal.  *Anderson v. Gen. Cas. Ins. Co.*, 402 Md. 236, 248 (2007).  If, however, an agent holds interests sufficiently adverse to the principal's interests, the knowledge of the agent may not be imputed to the principal.  *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-72 (4th Cir. 1995); *accord Shah v. HealthPlus, Inc.*, 116 Md.App. 327, 342 (1997).  This concept, known as the adverse interest exception, recognizes that legal fictions must sometimes give way to reality.  *Martin Marietta Corp.*, 70 F.3d at 771.

These agency principles might not extend to *all* forms of fiduciary relationships, but that issue need not be definitively decided here.  PNC's knowledge as a purported fiduciary would not be imputable to Tenenbaum even if agency principles did apply.  This is because the amended complaint contains facts sufficient to apply the adverse interest exception.

According to the amended complaint, PNC was advancing its own economic interests at the expense of Tenenbaum's interests. In particular, the amended complaint contends that PNC was motivated by its own desire to close the loan supporting the Professional sale. The amended complaint states that this self-interest motivated PNC to help Geoghegan in his fraud by concealing material financial information, even though that concealment endangered Tenenbaum's interest. Such facts, if proven, would certainly call into question the identity of interests between Tenenbaum and PNC, as PNC would become part of the fraud. "[I]t simply makes no sense to charge the victim of a fraudulent scheme with knowledge possessed by one of the alleged participants in the scheme." *In re Nat'l Mortg. Equity Corp. Pool Certificates Sec. Litig.*, 636 F.Supp. 1138, 1169 (C.D.Cal. 1986).

Geoghegan also complains that Tenenbaum did not allege fraud with sufficient particularity. He observes that Tenenbaum did not specifically quote or attach to the complaint the September 2006 memorandum Geoghegan allegedly wrote. He maintains that the "precise nature" of the misrepresentation related to that memorandum remains unclear. (ECF No. 16, at 5). He also contends that Tenenbaum has not clearly stated what information Geoghegan wrongfully failed to disclose.

The amended complaint meets the requirements of Rule 9(b). Although a plaintiff may of course attach a relevant document to the complaint if it helps him meet Rule 9(b)'s exacting standard, he is not *required* to do so. Rather, under Federal Rule of Civil Procedure 9(b), Tenenbaum must plead with particularity the time, place, and contents of the purported misrepresentations, as well as the identity of the person who made the misrepresentation and what he gained from making it. *Haley v. Corcoran*, 659 F.Supp.2d 714, 721 (D.Md. 2009).

Tenenbaum has met that standard for both his claims. As to the misrepresentation claim, it states that Geoghegan made the misrepresentation on a particular date (September 26, 2006) and in a particular form (a written memorandum). The memorandum contained particular misrepresentations overstating revenue in 2006 up to the date of the memorandum. The memorandum also misstated expected earnings for the remainder of the year – and such misrepresentations could amount to fraud. *See Cooper v. Berkshire Life Ins. Co.*, 148 Md.App. 41, 73-74 (2002); *Ward Dev. Co., Inc. v. Ingrao*, 63 Md.App. 645, 656 (1985). Tenenbaum states that Geoghegan wrote the memorandum in an effort to convince him to buy Professional. As for Tenenbaum's concealment claim, the amended complaint provides that Geoghegan did not disclose "the balance sheets and revenue figures for January 1, 2006 to September 30, 2006" before the Professional

sale.  (ECF No. 11 ¶ 21).  Tenenbaum maintains those figures
would have revealed that 2006 revenue "had deteriorated and was
not tracking close to revenue numbers."  (*Id.* ¶ 19).  Such
allegations are sufficient.

Finally, the complaint is sufficient even if it does not
allege that Geoghegan had a duty to disclose the relevant
information.  To be sure, Maryland ordinarily does not impose a
general duty on every party to a transaction to disclose facts
to the other party.  *Sass v. Andrew*, 152 Md.App. 406, 430
(2003).  But Maryland law also recognizes that, even where there
is no duty to disclose, a person who suppresses or conceals
facts that materially qualify other representations that person
has made may be found liable for fraud.  *Hogan v. Maryland State
Dental Ass'n*, 155 Md.App. 556, 567 (2004); *Sass*, 152 Md.App. at
430; *Cooper*, 148 Md.App. at 70.  That is exactly what Tenenbaum
alleges happened here.  According to him, Geoghegan
misrepresented Professional's financial state and then withheld
the financial information that would have revealed his lie.
Those facts present an actionable fraud claim.

### 2.  Count II: Breach of the Covenant of Good Faith and Fair Dealing

Tenenbaum's claim for breach of the covenant of good faith
and fair dealing must be dismissed.  Geoghegan correctly notes
that there is no independent cause of action in Maryland for

breach of such a covenant. *See, e.g., Cutler v. Wal-Mart Stores, Inc.*, 175 Md.App. 177, 195 (2007); *Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 170 Md.App. 457, 471-72 (2006). This court has said so on several occasions. *See, e.g., Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F.Supp.2d 785, 794 (D.Md. 2002); *Baker & Sun Co., Inc. (R&M)*, 985 F.Supp. 609, 610 (D.Md. 1997).

Tenenbaum responded by attempting to dismiss this count voluntarily, apparently in an effort to obtain dismissal without prejudice. Federal Rule of Civil Procedure 41(a) – which governs voluntary dismissals - applies only when a party seeks to dismiss an entire action, not merely one claim or count. *Shilling v. Northwestern Mut. Life Ins. Co.*, 423 F.Supp.2d 513, 520 n.13 (D.Md. 2006). Moreover, any future attempt to bring this claim would be futile.

Therefore, this claim against Geoghegan will be dismissed with prejudice.

### 3.  Count III: Breach of Fiduciary Duty

Count three against Geoghegan must also be dismissed. While the amended complaint contains numerous facts that attempt to demonstrate a fiduciary relationship between Tenenbaum and PNC, it is devoid of any such facts concerning Geoghegan. The allegations falling under this count refer exclusively to PNC, with the exception of fleeting references to "Defendants."

Tenenbaum does not even attempt to justify this claim in his opposition. And while Geoghegan does not raise the point in his motion, it is worth noting that Maryland would not seem to recognize an independent cause of action for breach of fiduciary duty, at least where other remedies are available. *Latty v. St. Joseph's Soc'y of Sacred Heart, Inc.*, --- Md.App. ----, No. 2487, 2011 WL 1226400, at *6 (Apr. 4, 2011); *Swedish Civil Aviation Admin.*, 190 F.Supp.2d at 801.

Count three will be dismissed against Geoghegan.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss filed by PNC will be granted, while the motion to dismiss filed by Geoghegan will be granted in part and denied in part. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
